**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 09-CR-141-TCK |
| ) | |
| KENNETH FRANK MCHUGH, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Before the Court is Defendant's Motion to Suppress Evidence and Statements (Doc. 17).

**I.     Factual Background**

The following facts were presented at the January 7, 2010 hearing before the Court ("January 7 hearing"). On September 15, 2009, around 2:00 a.m., Benjamin Terrero ("Terrero"), the security officer for the Observation Point Apartment complex in Tulsa, Oklahoma, was patrolling the complex in his vehicle. He had been hired to enforce a 10 p.m. curfew that was in place due to criminal activity occurring at the complex. While on patrol, Terrero observed two white males. One of these men, who was located between Buildings 14 and 15, appeared to recognize Terrero's vehicle and ran towards a Chevy Impala ("Impala") that was parked near Building 8. This individual, later identified as Defendant, got in the driver's side of the vehicle. The other individual, who was located close to Building 8, began to duck in between cars towards the passenger side of the Impala, eventually getting into the passenger side of the car.

Terrero moved his car behind the Impala, directing his spotlight on the vehicle. Terrero testified that he approached the Impala and noticed that the passenger, who had just entered the vehicle, was pretending to be passed out. Terrero first asked Defendant what apartment he came from. According to Terrero, Defendant was unable to provide Terrero with this information; nor

could Defendant provide Terrero with the name of an individual he was allegedly visiting. Terrero then asked Defendant what he was doing there. Defendant responded by stating that he was there to pick up his friend, who was passed out in the passenger seat.

While located at the driver's window, Terrero could see that Defendant's right hand was between the driver's seat and the center console. Terrero could not determine what was in Defendant's right hand, but believed that Defendant was trying to conceal something. At some point, the passenger of the Impala "woke up" and, according to Terrero, started to open the passenger door. Terrero went to the passenger side of the vehicle and kicked the door shut. He then went to the front of the vehicle so he could view both men, directing the men to show their hands. Terrero observed two tools inside the Impala – namely, (1) a screwdriver located between the center console and the driver's seat and (2) a hammer, located on the floor by the passenger. Terrero testified that these tools increased his suspicion because he knew individuals used such tools to break into cars.

Terrero stated that Defendant tried to open the driver's side door so as to exit the vehicle. After Defendant continued to attempt to exit the vehicle against Terrero's orders, Terrero then sprayed Defendant with pepper spray and called 911. While conversing with police dispatch, Terrero held the men at gunpoint. Terrero testified that he did not speak to any officers when he was on the phone with dispatch and that he did not receive any instructions or directions from police officers.      Tulsa Police Officers Keith Oakes ("Officer Oakes") and Mark Brisbin ("Officer Brisbin") were radio dispatched to assist Terrero at the apartment complex. Officer Oakes testified that he had previously been called to the Observation Point Apartment complex on numerous occasions in response to criminal activity. Most recently, Officer Oakes had responded to calls for

"domestics" and car robberies in the weeks prior to September 15, 2009. According to Officer Oakes' testimony, when he received the call on September 15, 2009, dispatch advised him of the following: (1) a security officer had two subjects at gun point; and (2) the subjects were suspected to have a weapon in the car. When the officers arrived, they viewed Terrero standing at the back of the Impala. Officer Oakes saw Terrero pointing his gun at the two subjects in the car, and spoke to Terrero briefly before approaching the car. According to Officer Oakes, Terrero reported the following: (1) he observed the two men "lurking" in the complex; (2) they had made him feel "uneasy"; (3) they were acting "hinky"; (4) they were not obeying his commands; (5) they were trying to exit the vehicle; and (6) he sprayed Defendant with pepper spray.

Officer Oakes then approached the driver's side door, while Officer Brisbin focused his attention on the passenger side of the vehicle. Officer Oakes ordered Defendant to open the door and back out towards the back of the Impala. As Defendant stepped out of the vehicle, he told Officer Oakes that he had a gun, although he did not indicate to Officer Oakes where the gun was located. Officer Oakes then placed Defendant on his knees, handcuffed him, and patted him down. During the pat-down of Defendant's person, Officer Oakes found a gun in Defendant's right rear pocket. The gun was later identified as a black, Charter Arms, "Off Duty", .38 SPL caliber, revolver, serial number 948445 loaded with 5 rounds, Prvi Partizan, Serbia, .38 spl., FMJ, ammunition. Finally, Officer Oakes testified that at no point did he communicate with Terrero prior to arriving at the apartment complex.

As a result of these events, Defendant was charged in an one-count Indictment with possession of firearm and ammunition after conviction of a felony in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Defendant now seeks to suppress all evidence – including the gun,

ammunition, and certain statements – obtained as a result of the events occurring on September 15, 2009.

**II.    Discussion**

Defendant argues he was unlawfully seized by Terrero and the officers in violation of the Fourth Amendment and that all evidence and statements obtained as a result should therefore be suppressed.  The Government, in response, maintains as follows: (1) Terrero's actions cannot be attributed to the Government; (2) the officers lawfully seized Defendant because they had a reasonable suspicion that criminal activity was occurring; and (3) the subsequent pat-down of Defendant was lawful because it was necessary to protect the officers' safety.

**A.    Whether Actions of Terrero can be Attributed to Government**

Fourth Amendment protection against unreasonable searches and seizures "is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." *United States v. Smythe*, 84 F.3d 1240, 1242 (10th Cir. 1996) (internal citations omitted). "However, in some cases a governmental search by a private citizen may be transformed into a governmental search implicating the Fourth Amendment if the government coerces, dominates or directs the actions of a private person conducting the search or seizure." *Id.*  The Court must therefore determine whether Terrero's actions can be attributed to the Government in order to determine at what point the applicable Fourth Amendment analysis begins.

Based on the testimony presented at the hearing, the Court is unpersuaded that Terrero's actions should be transformed into a governmental search or seizure because there was no evidence indicating that the police officers "coerc[ed], dominat[ed], or direct[ed]" Terrero's actions.  *Id.*

Rather, the testimony before the Court demonstrated that the officers had absolutely no contact with Terrero prior to arriving at the apartment complex. Terrero was not provided any direction or instruction from any police officer; nor was evidence presented that he was in any manner coerced or dominated by any governmental actors. Rather, the officers in question only became involved in the instant matter after Terrero initiated a phone call to 911 in order to receive assistance from the police. Given these facts, the Court rejects Defendant's argument that the actions of Terrero should be attributed to the Government.

### B. Whether Seizure of Defendant by Officers was Lawful

At the January 7 hearing, the Government conceded the fact that Defendant was "seized" for the purposes of the Court's analysis. The Court must therefore turn to the question of whether Defendant's seizure was lawful under the Fourth Amendment. The Government contends Defendant was lawfully detained because, based on the information provided to them by dispatch and Terrero, the officers had a reasonable and articulable suspicion that he was involved in criminal activity.

"Under [*Terry v. Ohio*, 392 U.S. 1 (1968)], a law enforcement officer may stop a person without probable cause for arrest if the officer has a reasonable and articulable suspicion that the person might be involved in criminal activity." *United States v. Harris*, 313 F.3d 1228, 1234 (10th Cir. 2002). "[A]n officer with reasonable suspicion need not rule out the possibility of innocent conduct as long as the totality of the circumstances suffices to form a particularized and objective basis for a [detention]." *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004) (internal quotation marks omitted). "Moreover, reasonable suspicion may be supported by an objectively reasonable good faith belief even if premised on factual error." *Id.* (internal quotation marks omitted). "[I]n cases where the conduct justifying the stop was ambiguous and susceptible of an

innocent explanation, *Terry* recognized that the officers could detain the individuals to resolve the ambiguity." *United States v. Dennison*, 410 F.3d 1203, 1208 (10th Cir. 2005). The Court must consider whether the "facts as a whole" amount to reasonable suspicion. *Id.*

After consideration of the evidence in the record, the Court finds the officers lawfully seized Defendant because they had a reasonable and articulable suspicion that Defendant might be involved in criminal activity. Specifically, the officers were called by dispatch sometime after 2 a.m. and were informed that a security officer had two subjects at gun point at the Observation Point Apartment complex. The officers were aware that the complex had been the site for criminal activity in recent weeks and months. Dispatch also informed the officers that the subjects were suspected to have a weapon in the car. Once the officers arrived at the apartment complex, they observed Terrero holding two men at gunpoint in a car. Terrero then informed Officer Oakes that the men had been lurking in the complex, made him feel uneasy, were acting "hinky," were not obeying his commands, and attempted to exit the vehicle despite his orders. Taken together, the Court finds that this information could lead the officers to have a reasonable suspicion that Defendant was engaged in criminal activity. *See United States v. Charles*, 576 F.3d 1060, 1065 (10th Cir. 2009) (considering fact that officers encountered defendant in a high-crime area late at night in determining whether they had reasonable suspicion that defendant was engaged in wrongdoing); *United States v. Crespin*, No. 1:07-cr-43-TC, 2007 WL 4246298, *5 (D. Utah. Nov. 28, 2007) (unpublished) (finding that defendant's uncooperative behavior created concerns for officer safety and justified *Terry* stop when defendant disobeyed officers' orders); *United States v. Garner*, No. 2:03-cr-320-W, 2004 WL 734096, *4 (D. Utah Jan. 8, 2004) (unpublished) (finding officer had a reasonable and articulable suspicion that criminal activity was afoot, in part because

information provided by police dispatch was corroborated when officers arrived at scene and defendant was acting "very unusual").

### C.    Whether Pat-Down of Defendant's Person was Lawful

"During an investigative detention, police officers are authorized to take reasonable steps necessary to secure their safety and maintain the status quo. In some circumstances, these safety measures may include a pat-down search for weapons." *United States v. Albert*, 579 F.3d 1188, 1195 (10th Cir. 2009) (internal citations omitted). An officer may conduct a pat-down search if he has an articulable and reasonable suspicion that the person is armed and dangerous. *United States v. Hishaw*, 235 F.3d 565, 570 (10th Cir. 2000). Further, "a *Terry* frisk is only valid if it is confined to a search for weapons because the purpose of the limited pat-down search is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence." *Id.*; *see United States v. Johnson,* 364 F.3d 1185, 1195 (10th Cir. 2004) (holding an officer's pat-down search was permissible where he "confined his search strictly to what was minimally necessary to ensure [the defendant] was not armed") (quotations omitted).

Based on the evidence in the record, Officer Oakes had a reasonable suspicion that Defendant was armed and dangerous. Defendant quickly told Officer Oakes that he had a gun, although he did not specify where the gun was located. The fact that Defendant had a gun, coupled with the other information known to Officer Oakes at the time – namely, that Defendant had been lurking in the complex, was acting "hinky," made Terrero feel "uneasy," and disobeyed Terrero's commands – gave Officer Oakes an articulable and reasonable suspicion that Defendant was not only armed, but dangerous. The pat-down of Defendant's person was thus necessary in order to adequately ensure officer safety, especially given the fact that Defendant failed to specify where the

gun was located. Finally, there was no evidence presented to the Court indicating that the pat-down was excessive in scope.

## III. Conclusion

For the reasons outlined herein, Defendant's Motion to Suppress Evidence and Statements (Doc. 17) is DENIED.

**IT IS SO ORDERED this 11th day of January, 2010.**

_____
**TERENCE KERN**
**Senior United States District Judge**